UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GERALD MALONE<br>Petitioner,<br><br>v.<br><br>KATHLEEN M. DENNEHY<br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No.04-10283-RWZ |

RESPONDENT'S MEMORANDUM OF LAW
IN OPPOSITION TO THE PETITION FOR HABEAS CORPUS

After a jury trial before Massachusetts Superior Court Associate Justice Gerald F. O'Neill, the petitioner was found guilty of three counts of rape and abuse of a child under 16 and one count of indecent assault and battery on a child under 14. After unsuccessfully pursuing a motion for a new trial and an appeal in the Massachusetts state courts, the petitioner filed the instant petition for habeas corpus pursuant to 28 U.S.C. § 2254. By this habeas action, the petitioner contends that his continued incarceration by the respondent, Kathleen M. Dennehy, the Commissioner of the Massachusetts Department of Corrections, violates federal law. This memorandum of law is submitted in opposition to the petition for habeas corpus. The petition must be denied where the petitioner cannot demonstrate that the state court's adjudication of his claims on the merits resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

## PRIOR PROCEEDINGS

On August 10, 1999, a Barnstable County grand jury returned an indictment charging the petitioner with one count of committing an unnatural/lascivious act on a child under 16; three

counts of rape and abuse of a child under 16; and one count of indecent assault and battery on a child under 14. *See* Respondent's Supplemental Answer, [hereinafter cited as "Supp. Ans., Ex.__"] Exhibit 1, Docket Entries, *Commonwealth v. Malone,* BACR1999-48402. On December 1, 2000, after a jury trial before Massachusetts Superior Court Associate Justice Gerald F. O'Neill, the petitioner was found guilty of three counts of rape and abuse of a child under 16 and one count of indecent assault and battery on a child under 14. *Id.* The charge of committing an unnatural/lascivious act on a child under 16 was dismissed by the Commonwealth at the close of all the evidence. *Id.* Judge O'Neill sentenced the petitioner to a state-prison term of a minimum of nine years and a maximum of twelve years for the first count of rape and abuse of child under 16; along with two concurrent state-prison terms of a minimum of nine years and a maximum of twelve years for the second and third counts of rape and abuse of a child under 16. *Id.* The petitioner was also sentenced to a state-prison term of a minimum of six years and a maximum of nine years for his conviction of indecent assault and battery on a child under 14 to be served concurrently with the first count of rape and abuse of a child under 16. *See* Supp. Ans., Ex. 1. The petitioner timely noticed an appeal of his convictions. *Id.* On July 16, 2001, the petitioner filed a motion for new trial in Barnstable Superior Court, claiming the following: (1) trial counsel was ineffective for failing to serve Officer Gomsey with a subpoena to compel her presence at trial; and (2) the trial court's refusal to grant the defense a continuance to serve Officer Gomsey violated the petitioner's right to counsel and due process. *See* Supp. Ans., Ex. 1 and 2. On the same day, Massachusetts Superior Court Associate Justice Richard F. Connon denied the motion for new trial. *See* Supp. Ans., Ex. 1 and 3.

In his consolidated appeal to the Massachusetts Appeals Court the petitioner claimed that (1) trial counsel was ineffective for failing to serve Officer Gomsey with a subpoena to compel her presence at trial; and (2) the trial court's refusal to grant the defense a continuance to serve Officer Gomsey violated the petitioner's right to counsel and due process. *See* Supp. Ans., Ex. 4. On December 30, 2002, in a memorandum and order pursuant to Rule 1:28, the Appeals Court affirmed the petitioner's convictions and the denial of his motion for a new trial. *See* Supp. Ans., Ex. 6, *Commonwealth v. Malone*, 56 Mass. App. Ct. 1117, 780 N.E.2d 489 (2002). On January 17, 2003, the petitioner filed an Application for Leave to Obtain Further Appellate Review ("ALOFAR") in the Massachusetts Supreme Judicial Court ("SJC") that was denied on February 27, 2003. *See* Supp. Ans., Ex. 7 and 9.

On February 11, 2004, the petitioner filed the instant petition for habeas corpus pursuant to 28 U.S.C. § 2254. The respondent filed an answer and supplemental answer on May 4, 2004. The petitioner filed a memorandum of law in support of his petition for habeas corpus on June 28, 2004 and the respondent hereby submits this memorandum of law in opposition to the petition for habeas corpus.

### STATEMENT OF FACTS[1]

At the time of the trial, the victim, K.M., was fifteen years old. (Tr.1/111-12). The petitioner is her father and her mother is Brenda Malone. (Tr.1/112). She also has a younger

---

[1] By convicting the petitioner and then affirming his conviction, the jury and the state courts did not accept his version of events. *See, e.g., Marshall v. Lonberger*, 459 U.S. 422, 433-34 (1983); *McCambridge v. Hall*, 303 F.3d 24, 40 (1st Cir. 2002) (guilty verdict necessarily means that jury accepted the testimony inculpating the defendant and necessarily rejected the defendant's contrary testimony).

sister, Whitney, who is four years younger than the victim. (Tr.1/152). The petitioner began living with the victim and her mother when the victim was approximately three or four years old. (Tr. 1/113). Her parents were unmarried at the time. (Tr. 1/113). The petitioner lived off and on with the victim's family over the years. (Tr.1/224).

When the victim was eleven years old, she lived with her family at Treasure Lane in South Yarmouth. (Tr. 1/113-15). The petitioner called her into his bedroom and asked her if she could do him a favor. (Tr.1/115). The petitioner was lying on the bed, covered by the blankets. (Tr.1/115). He had a pornographic tape running in the videocassette player. (Tr.1/116). When the victim asked what she could do for him, the petitioner pulled off the blanket and told her to "suck this for [him]." (Tr.1/116). The petitioner was naked under the covers. (Tr.1/115). The victim did what the petitioner asked, and performed oral sex on him. (Tr.1/116). While she was doing so, she accidentally bit the petitioner's penis. (Tr.1/116). The petitioner hit her on the head and said, "Don't bite my shit again." (Tr.1/117). The victim continued to perform oral sex until the petitioner ejaculated. (Tr. 1/117).

Approximately two weeks later, after the victim had returned home from school, the petitioner called her into the living room and asked her if she remembered the favor he had asked her to do. (Tr.1/117). The victim replied yes, but she also indicated that she thought she did not have to do it anymore. (Tr.1/117). The petitioner told the victim he had changed his mind. (Tr.1/117). The victim, who was afraid, began to perform oral sex on the petitioner in the living room. (Tr.1/117-18). The petitioner then moved them into Brenda's bedroom because he did not want to take any risks. (Tr. 1/118). The victim performed oral sex on the petitioner in her mother's bedroom. (Tr. 1/118).

4

There was a certain tradition in this family that each child received a limousine for her twelfth birthday. (Tr.1/118-19). A few days before the victim's twelfth birthday, the petitioner called the victim into her mother's bedroom from her own bedroom. (Tr.1/119). The petitioner told the victim that if she wanted a limousine then she needed to earn it. (Tr.1/119). The victim asked how to earn the limousine and he replied that she should do what she normally does. (Tr.1/119). The petitioner gave her the option to perform oral sex after her birthday, but the victim chose to perform oral sex at that time. (Tr. 1/119). The petitioner ordered the victim to remove all of her clothes, he then pulled off the covers to reveal himself, wearing only a shirt. (Tr. 1/119). After ordering the victim to suck on his penis, he then ordered her to lay on her back on the bed in her mother's bedroom. (Tr.1/120). After kissing the victim and feeling her breasts and vagina, the petitioner licked the victim's vagina. (Tr.1/120). At this point, the petitioner engaged the victim in sexual intercourse. (Tr.1/121).

The petitioner and Brenda were married in June, 1997, but the petitioner moved in with Brenda, the victim and Whitney a few months before the wedding. (Tr.1/121). On one occasion the victim was in trouble because she came home late one night. (Tr.1/121). When the victim walked in the door, her mother began to yell at her. (Tr.1/122). The petitioner intervened and told Brenda to stop yelling at the victim. (Tr.1/122). The petitioner and Brenda than had an argument while the victim went to her room. (Tr.1/122). The petitioner called the victim downstairs and together they entered his car. (Tr.1/122). The petitioner told the victim she could get out of trouble and the victim replied okay. (Tr.1/122). The victim thought she would get a beating because when she was in trouble the petitioner normally would beat her. (Tr.1/123). Thus, being out of trouble meant that the petitioner would not beat her. (Tr. 1/123).

As they drove down the street, the petitioner unzipped his pants and the victim placed her mouth on his penis while he drove. (Tr.1/123). They drove until the petitioner ejaculated. (Tr.1/123). They then drove to the local Stop and Shop to run an errand. (Tr.1/123). The petitioner had told Brenda that he and the victim were going to this store. (Tr.1/123).

In August, 1998, the victim, Brenda, Whitney, and the petitioner moved in with the petitioner's brother, the victim's Uncle Tony. (Tr.1/124). Many instances of sexual abuse occurred here. (Tr.1/124). On one occasion while they were living with Uncle Tony, the victim came home from school with a bad progress report. (Tr.1/124). When she showed it to the petitioner he became angry and asked why it was not good. (Tr. 1/125). The victim told the petitioner that she was doing the best that she could, but the petitioner accused her of lying. (Tr.1/125). When she disagreed with the petitioner, he ordered her to drop her pants. (Tr. 1/125). The victim testified that when the petitioner told her to "drop her drawers," it meant to take off everything below the waist. (Tr.1/126). She had been punished this way before. (Tr.1/126). The petitioner then took his belt and beat her, asking her all the time why her report card was so bad. (Tr.1/126). Every time she told the petitioner that she did not know, he would tell her that she was lying. (Tr.1/126). Each time he looked at the progress report, he became angrier, and would continue to beat her. (Tr.1/126). The beating occurred in the living room. (Tr.1/127). At that time Uncle Tony had taken the car and gone shopping. (Tr.1/127). When Uncle Tony drove into the driveway, the petitioner told the victim to pull up her pants and stop crying. (Tr. 1/127).

On another occasion when the victim came home from school, the petitioner asked her if there were any problems at school, and the victim said no. (Tr.1/127). The petitioner told her that he had received a telephone call from her school stating that she had detention. (Tr.1/127).

6

When the victim had no explanation for her detention, the petitioner became angry and began hitting her and beating her with a belt. (Tr.1/128). The victim was still dressed when the petitioner began to swing the belt at her and hit her with it. (Tr.1/128). They were in the bedroom at this time when the petitioner told the victim to close the door and the curtains. (Tr.1/128). The petitioner then layed down on the bed, unzipped his pants and told the victim that she had a chance to redeem herself. (Tr.1/129). The victim agreed. (Tr.1/129). She knew that if she had not chosen to do what the petitioner wanted, she would have been beaten and she did not want a beating. (Tr.1/129). The victim began to perform oral sex on the petitioner because that is what he wanted her to do. (Tr. 1/129). As the victim was still crying, she accidentally bit the petitioner's penis. (Tr.1/129). The petitioner grabbed her by the neck, and squeezed it from behind. (Tr.1/129). He asked her what her problem was, and she said she was sorry. (Tr.1/129). The petitioner then had the victim continue to perform oral sex. (Tr.1/130). She again bit his penis. (Tr.1/130). This time the petitioner had the victim remove all of her clothes and beat her with a belt. (Tr.1/130). He then had her lie down on the bed and had sexual intercourse with her. (Tr. 1/130).

On another occasion while living at Uncle Tony's, the petitioner called the victim into the bedroom he shared with Brenda, after Brenda had left with Whitney to run some errands. (Tr.1/130). The petitioner thought that Brenda and Whitney had left, and he ordered the victim to perform oral sex. (Tr.1/31). At this point, Brenda, who had returned to the house only moments after she left, noticed the bedroom door was closed. (Tr.1/210). When she opened the door, the victim jumped and sat at the end of the bed. (Tr.1/131/210). Brenda asked the

victim why she jumped, and the victim responded, "No reason." (Tr.1/210). Both the petitioner and the victim denied anything was going on. (Tr.1/131, 211).

Around October, 1998, the victim, Brenda, and Whitney moved in with an aunt and her family. (Tr.1/133-33). The petitioner remained at Uncle Tony's. (Tr.1/132). The petitioner would call Brenda and ask for permission to see the girls. (Tr.1/132). The victim testified that the petitioner would get to see them anytime he called and Brenda felt like getting rid of them. (Tr.1/132-33). During Christmas, 1998, they were still living with their aunt. (Tr.1/133). While they were opening presents and having a good time, the petitioner called. (Tr.1/133). Brenda told the victim and Whitney to get dressed because the petitioner was coming to get them. (Tr.1/134). The victim said she did not want to go with the petitioner and asked her mother not to make her go. (Tr.1/134). Brenda told the victim that she did not care if the victim did not want to go, she needed time by herself. (Tr.1/134). When the petitioner arrived to pick up the girls, Brenda told him that the victim did not want to go with him, and was in fact crying and begging not to go with him. (Tr. 1/134). Once in the car, the petitioner said that he heard that the victim did not want to go with him. (Tr.134). The victim replied it was true. (Tr. 1/134). When the petitioner asked why, the victim lied and said that she wanted to spend Christmas with her mother. (Tr.1/134). The petitioner became angry, yelling and screaming on the way to Uncle Tony's. (Tr.1/134). He was so furious that he took the victim's head and smashed it against the car window. (Tr.1/134-135). He grabbed her from the back of the neck and pushed her down, and smacked her upside the head and across the face. (Tr.1/135). The petitioner grabbed her face and hit her. (Tr. 1/135). Whitney was in the car during this episode. (Tr.1/135). When they arrived at Uncle Tony's, the petitioner told Whitney to go outside and

8

play because he needed to talk with the victim. (Tr.1/135). Whitney went outside while the petitioner and the victim went into the petitioner's room. (Tr.1/135). The petitioner was still furious, he yelled and screamed at her, while also hitting her. (Tr.1/136).

The petitioner told the victim to lie on the bed, he then touched her breasts and vagina over her clothes. (Tr.1/136). Upon the petitioner's demand, the victim removed her pants and the petitioner touched her vagina, placing his fingers inside her vagina. (Tr.1/136). The petitioner grabbed her neck, put her mouth on his penis and ordered her to suck it, which she did. (Tr.1/136-37). The petitioner then placed himself on top of her and had intercourse with her. (Tr.1/137).

Brenda, the victim and Whitney moved again to a house on West Yarmouth Road and the petitioner came back to live with them. (Tr.1/137). At some point Brenda left the house for a week, leaving the petitioner with the victim and Whitney. (Tr.1/137-138). On one of the mornings Brenda was out of the house, the petitioner had Whitney wake up the victim. (Tr.1/138). After the victim awoke, she went to the petitioner's room with Whitney. (Tr.1/138). The petitioner said he needed to talk with the victim and asked Whitney to go downstairs and do the dishes and not to come back until he asked her to. (Tr. 1/138). Whitney said yes. (Tr.1/138). Upon the order of the petitioner, the victim closed the door and pushed play on the videocassette recorder. (Tr.1/138). The petitioner told the victim to come to him, pulled down the covers, and ordered her to suck his penis. (Tr. 1/138). The victim sucked the petitioner's penis, while he rubbed her breasts and vagina over her clothes. (Tr.1/138-39). The petitioner then told the victim to stop and take the bottom half of her clothes off. (Tr.1/139). The victim took off the bottom half of her clothes off and the petitioner felt her vagina without her clothes

9

on. (Tr.1/139). The petitioner then told the victim to lay on her back, she did, and he started

licking her vagina. (Tr. 1/139). The he stopped and put himself on top of her and had

intercourse. (Tr.1/139).

Around July 20, 1999, Brenda and the petitioner argued in the house, and the petitioner

said he was leaving. (Tr.1/141). Brenda and the petitioner called the victim downstairs, and the

petitioner asked Brenda if it was okay to say good bye to the kids. (Tr.1/141-42). The petitioner

took the victim and Whitney to Friendly's Restaurant. (Tr. 1/142). He gave Whitney some

money and told her to go into the restaurant and get something to eat because he needed to talk

with the victim. (Tr.1/142).  The petitioner and the victim were sitting in the car when he asked

her if she was going to tell Brenda about the sexual abuse. (Tr.1/142). The victim said that she

was going to tell her mother what was going on and she still planned on telling her. (Tr.1/142-

43). The petitioner asked the victim if she would give him some time before she told Brenda.

(Tr.1/143). When the victim reluctantly said she would give him some time, he asked her what

he could give her to keep her quiet until he left. (Tr. 1/143). The victim told him that she did

not want anything from him. (Tr. 1/143).  The petitioner told the victim that he would give her

his pager if she would remain quiet for at least 24 hours. (Tr.1/143). He told her he would give

her his cellular phone if she would keep quiet for at least three weeks. (Tr. 1/143). The victim

agreed. (Tr.1/143). The victim testified that the petitioner told her that if she would keep quiet

forever, he would send her $3000 every three months. (Tr.1/143). The victim took the pager

and the phone. (Tr.1/143). When Whitney came back to the car, the petitioner told his daughters

he was going to Michigan, and he was not coming back. (Tr.2/13). After the petitioner had

packed up his things and left, the victim told her mother that the petitioner had been sexually

abusing her for almost four and a half years. (Tr.1/145). Her mother took her to the police

station, where she spoke with Officer Cheryl Nugent-Gomsey. (Tr.1/145).

The victim did not tell about all of the times that the petitioner touched her or the sexual

abuse because the petitioner threatened her. (Tr.1/123). The petitioner told her that if she told

anyone, he would kill her. (Tr. 1/124). The victim testified that she had not told anyone earlier

about the petitioner's abuse because the petitioner had threatened to kill her. (Tr. 1/146).

## ARGUMENT

**The Habeas Petition Should Be Denied Where Both the Petitioner's Ineffective Assistance of Counsel Claim and Due Process Claim Were Properly Adjudicated by the Massachusetts Appeals Court Which Did Not Render A Decision That Was Contrary To, Or An Unreasonable Application of, Clearly Established Federal Law.**

### A.    The Standard of Review.

"Under the AEDPA, a state prisoner can prevail only if the state court's decision `was

contrary to, or involved an unreasonable application, of clearly established Federal law, as

determined by the Supreme Court of the United States.'" *Tyler v. Cain*, 533 U.S. 656, 660

(2001) (*quoting* 28 U.S.C. § 2254(d)(1)). A state-court decision is "contrary to" clearly

established Supreme Court precedent in only two circumstances: (a) where "the state court

applies a rule that contradicts the governing law set forth in" Supreme Court cases or (b) where

"the state court confronts a set of facts that are materially indistinguishable from a decision of

[the Supreme Court] and nevertheless arrives at a result different from [Supreme Court]

precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

A state-court decision involves an "unreasonable application" of Supreme Court

precedent "if the state court identifies the correct governing legal rule from [the Supreme]

Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.*

at 407-09, 413. Merely that the state court reached an incorrect result is not sufficient – the result also must be unreasonable. *L'Abbe v. DiPaolo*, 311 F.3d 93, 96 (1st Cir. 2002) (*citing Taylor*, 529 U.S. at 411); *see also McCambridge v. Hall*, 303 F.3d 24, 36-37 (1st Cir. 2002) (en banc) ("'some increment of incorrectness beyond error is required'.... The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court," *quoting Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). Where, for instance, the state court reaches a result that is "devoid of record support for its conclusion or is arbitrary," the unreasonable application prong likely will be satisfied. *McCambridge*, 303 F.3d at 37 (*citing O'Brien v. Dubois*, 145 F.3d 16, 25 (1st Cir. 1998)).

In some habeas cases, resolution of petitioner's claims will turn entirely on the state court's determination of the underlying factual issues. *DiBenedetto v. Hall*, 272 F.3d 1, 7 n.1 (1st Cir. 2001), *cert. denied*, 535 U.S. 1024 (2002). This is because, under the AEDPA, state court factual determinations are "presumed to be correct," unless the petitioner rebuts this "presumption of correctness" by coming forward with "clear and convincing evidence" to the contrary. 28 U.S.C. § 2254(e)(1); *Coombs v. Maine*, 202 F.3d 14, 18 (1st Cir. 2000). The presumption of correctness applies to all "basic, primary, or historical facts" underlying the state court's conclusion, *Sanna v. DiPaolo*, 265 F.3d 1, 7 (1st Cir. 2001); *see also Thompson v. Keohane*, 516 U.S. 99, 111-13 (1995) (for purpose of *Miranda*, scene-setting factual findings involving the trial court's assessment of credibility, are presumed to be correct), and extends to factual determinations made by both state trial and appellate courts. *Rashad v. Walsh*, 300 F.3d 27, 34 (1st Cir. 2002), *cert. denied*, 537 U.S. 1236 (2003).

12

**B.**     **Habeas Relief Should Be Denied Where the Appeals Court's Decision Relative to the Petitioner's Ineffective Assistance of Counsel Claim Was Neither Contrary to, Nor an Unreasonable Application of Supreme Court Precedent.**

The petitioner claims that his trial counsel's failure to subpoena officer Gomsey violated his right to the effective assistance of counsel. *See* Petition at ¶18 and Petitioner's Memorandum of Law at pp. 4-12. In *Williams v. Taylor*, 529 U.S. at 390-391, the Supreme Court held that *Strickland v. Washington*, 466 U.S. 668 (1984) was the clearly established federal law that controlled claims related to ineffective assistance of counsel. Thus, a petitioner alleging ineffective assistance of counsel must establish two elements in state court in order to prevail:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense.

*Ouber v. Guarino*, 293 F.3d 19, 25 (1st Cir. 2002), *citing Strickland*, 466 U.S. at 687.

In state court, the petitioner bore the heavy burden of proving ineffective assistance, *Scarpa v. DuBois*, 38 F.3d 1, 8-9 (1st Cir. 1994), *cert. denied*, 513 U.S. 1129 (1995); *Lema v. United States*, 987 F.2d 48, 51 (1st Cir. 1993), which required the two-part analysis articulated above. First, "'judicial scrutiny of counsel's performance must be highly deferential.'" *Ouber v. Guarino*, 293 F.3d at 25, *citing Strickland*, 466 U.S. at 689. Furthermore, the reviewing court must not lean too heavily on hindsight: a lawyer's acts and omissions must be judged on the basis of what he knew, or should have known, at the time his tactical choices were made and implemented. *Id., citing Bell v. Cone*, 535 U.S. 685, 696 (2002); *United States v. Natanel*, 938 F.2d 302, 309 (1st Cir. 1991), *cert. denied*, 502 U.S. 1079 (1992). Only if, "in light of all the

13

circumstances, the [alleged] acts or omissions of counsel were outside the wide range of professionally competent assistance," can a finding of deficient performance ensue. *Ouber v. Guarino*, 293 F.3d at 25, *quoting Strickland*, 466 U.S. at 690. Finally, counsel's alleged blunders are not to be "judged solely by the 'surrounding circumstances' of the representation, but, rather, [are to] be judged [by the state court] in light of the whole record, including the facts of the case, the trial transcript, the exhibits, and the applicable substantive law." *Scarpa v. DuBois*, 38 F.3d at 15. *See Matthews v. Rakiey*, 54 F.3d 908, 911 (1st Cir. 1995).

Secondly, even if a lawyer's performance is constitutionally unacceptable, relief will be withheld unless the petitioner demonstrates that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ouber v. Guarino*, 293 F.3d at 26, *quoting Strickland*, 466 U.S. at 694. While this level of prejudice may be presumed in a few settings, that is the exception, not the rule.[2] *Id.* (citing *Strickland*, 466

---

[2] The petitioner asserts that prejudice should be presumed "because of the constructive total denial of assistance of counsel that resulted from his counsel's failure to call a vital witness and the trial court's refusal to grant him the opportunity to call the witness." Petitioner's Brief at p. 6. In *Bell v. Cone*, 535 U.S. 685, 695 (2002), the Supreme Court held that prejudice may be presumed only in three narrowly circumscribed situations. First, a trial is presumptively unfair if the accused is completely denied the presence of counsel at a critical stage of the proceedings. *Bell*, 535 U.S. at 695 (citing *Hamilton v. Alabama*, 368 U.S. 52, 54 (1961). Second, such a presumption is warranted if "counsel entirely fails to subject the prosecutor's case to meaningful adversarial testing." *Id.* (quoting *United States v. Cronic*, 466 U.S. 648, 659 (1984). Third, prejudice may be presumed in the presence of circumstances under which a competent lawyer would likely not be able to render effective assistance. *Id.* (citing *Powell v. Alabama*, 287 U.S. 45 (1932). In the instant case, prejudice cannot be presumed where the state court record clearly demonstrates that the petitioner was not denied the presence of counsel at a critical stage of the proceedings. *See* Tr.I/II and Supp. Ans., Ex. 6, *Commonwealth v. Malone*, 56 Mass. App. Ct. 1117, 780 N.E.2d 489 (2002). Furthermore, prejudice cannot presumed because defense counsel did in fact subject the prosecutor's case to meaningful adversarial testing. *Id.* Finally, prejudice cannot presumed because there are no circumstances under which a competent lawyer would likely not be able to render effective assistance. *Id.*

14

U.S. at 694). Indeed, the petitioner must demonstrate that he was prejudiced, *i.e.*, that his attorney's parlous conduct may have altered the outcome of the case. *Id.* (citing *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000)). Although the possibility of a different outcome must be substantial in order to establish prejudice, it may be less than fifty percent. *Id.* (citing *Strickland*, 466 U.S. at 693 (explaining that "a [petitioner] need not show that counsel's deficient conduct more likely than not altered the outcome in the case")).

The petitioner claims that counsel was ineffective for failing to subpoena Officer Gomsey in order to impeach the victim by presenting inconsistent statements. *See* Petition at ¶ 18 and Petitioner's Memorandum of Law at pp.4-12. In its review of the record, the Appeals Court rejected this assertion with particularity:

> We conclude that the defendant here was not deprived of an otherwise available, substantial ground of defense. Officer Gomsey would only have provided cumulative impeachment testimony affecting the victim's credibility. "Generally, failure to impeach a witness does not amount to ineffective assistance of counsel." *Commonwealth v. Fisher*, 433 Mass. 340, 357, 742 N.E.2d 61 (2001). Here, moreover, the impeachment evidence was presented through other witnesses and evidence. The absence of Gomsey's evidence in this regard was not significantly prejudicial. *See Commonwealth v. Grenier*, 415 Mass. 680, 686, 615 N.E.2d 922 (1993) (where evidence of a witness's bias was shown through other evidence, no significant prejudice resulted from the absence of the excluded evidence). Most of the impeachment points raised by appellate counsel were either acknowledged by the victim herself or were presented through the victim's mother and her sister. Officer Gomsey's potential testimony would have been cumulative of testimony already in evidence. At the time of defense counsel's offer of proof on the value of Officer Gomsey's testimony, the trial judge remarked that defense counsel had not made a mistake in failing to call Officer Gomsey and that he had actually benefitted from the absence of Officer Gomsey.(FN1)[3]

---

[3] The Court: "I don't think you necessarily made a mistake; I think you obtained from the complaining witness the inconsistencies that were described to the officer, without permitting the officer to testify as to everything else that was told, because as I understand the doctrine, simply because someone makes an inconsistent statement, unless there's an accusation of recent contrivance, it doesn't make all other consistent statements admissible. So you've got the best of both worlds. So I don't see where you made any mistake." (Tr.2:74)

> We conclude that trial counsel was not ineffective in failing to secure Gomsey's testimony, where most of the proffered impeachment evidence was before the jury, and the defendant could not demonstrate that better work might have accomplished something material for his defense. *See Commonwealth v. Bart B.*, 424 Mass. 911, 916, 679 N.E.2d 531 (1997).

*See* Supp. Ans., Ex. 6, *Commonwealth v. Malone*, 56 Mass. App. Ct. 1117, 780 N.E.2d 489 (2002). In its decision, the Massachusetts Appeals Court applied the performance/prejudice framework analysis mandated by *Strickland*. It is of no consequence that the Appeals Court did not explicitly mention *Strickland* where it applied the Massachusetts' enunciation of the ineffective standard derived from *Commonwealth v. Saferian*, 366 Mass. 89, 315 N.E. 878 (1974). As the First Circuit has affirmed, *Saferian* is the functional equivalent of *Strickland*. *See Ouber v. Guarino*, 293 F.3d at 44, *citing Scarpa*, 38 F. 3d at 7-8. Since the Appeals Court identified and articulated the substance of the *Strickland* standard, and was not presented facts that were materially indistinguishable from those at issue in *Strickland*, the "contrary to" portion of the analysis drops from the equation. *See Williams v. Taylor*, 529 U.S. at 406 ("a run-of-the mill state-court decision applying the correct legal rule from our cases to the facts of the prisoner's case would not fit comfortably within §2254(d)(1)'s 'contrary to' clause"). In other words, *Strickland* and its progeny do not require an outcome "contrary to" that reached by the Appeals Court.

Further, a review of the Appeals Court's decision demonstrates that it was an objectionably reasonable application of *Strickland*. In the instant case, the record supports the Appeals Court's conclusion that the petitioner was not deprived of an otherwise available, substantial ground of defense where Officer Gomsey would only have provided cumulative impeachment testimony affecting the victim's credibility. *See* Supp. Ans., Ex. 6, *Commonwealth*

16

*v. Malone*, 56 Mass. App. Ct. 1117, 780 N.E.2d 489 (2002). The trial transcripts indicate that the victim was impeached through her own cross-examination and through the testimony of her mother and her sister. (Tr. 1/171-172; 1/175-77; 1/216; 1/226; 2/15; 2/22). As the Appeals Court noted, in response to the defense counsel's offer of proof on the value of Officer Gomsey's testimony, the trial judge replied,

> I don't think you necessarily made a mistake; I think you obtained from the complaining witness the inconsistencies that were described to the officer, without permitting the officer to testify as to everything else that was told, because as I understand the doctrine, simply because someone makes an inconsistent statement, unless there's an accusation of recent contrivance, it doesn't make all other consistent statements admissible. So you've got the best of both worlds. So I don't see where you made any mistake.

(Tr.2/74). Thus, the Appeals Court's conclusion that counsel was not ineffective in failing to impeach the victim by presenting inconsistent statements through Officer Gomsey cannot be considered objectively unreasonable. Accordingly, the petitioner cannot demonstrate that the decision of the Massachusetts Appeals Court unreasonably applied *Strickland*. Habeas relief should be denied.

### C.   Habeas Relief Should Be Denied Where the Appeals Court's Decision Relative to the Petitioner's Due Process and Ineffective Assistance of Counsel Claim Was Neither Contrary to, Nor an Unreasonable Application of Supreme Court Precedent.

The petitioner also claims that the trial court's refusal to grant him a continuance for the purpose of securing the attendance of Officer Gomsey violated his right to due process and his right to the effective assistance of counsel. *See* Petition at ¶ 18 and Petitioner's Memorandum of Law at pp. 12-15. In *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964), the Supreme Court held that the decision to grant or deny a continuance is a matter "traditionally within the discretion of the trial judge. . . " The judge's discretion in this regard is necessarily broad, even in cases where

17

"the party fails to offer evidence or is compelled to defend without counsel." *Id.* at 589 (citing *Avery v. Alabama*, 308 U.S. 444 (1940); *see also Morris v. Slappy*, 461 U.S. 1, 11 (1982) ("Trial judges necessarily require a great deal of latitude in scheduling trials."). Plainly then, "[n]ot every restriction on counsel's time or opportunity to investigate or to consult with his [or her] client or otherwise prepare for trial violates a defendant's" constitutional rights. *Morris v. Slappy*, 461 U.S. at 11. "[O]nly an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay'" will rise to the level of a constitutional violation. *Id.* at 11-12 (quoting *Ungar v. Sarafite*, 376 U.S. at 589). Moreover, in the habeas context, the issue is not merely whether the state trial judge abused his or her discretion in denying a continuance, but whether the denial was "'so arbitrary and fundamentally unfair that it violate[d] constitutional principles of due process.'" *Skillern v. Estelle*, 720 F.2d 839, 850 (5th Cir.), *cert. denied*, 469 U.S. 873 (1984).

There are, as the Supreme Court has held, "no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar v. Sarafite*, 376 U.S. at 589. Other factors to be considered may include such things as "'the amount of time needed for effective preparation, the amount of time actually available for preparation, the amount of time previously available for preparation and how assiduously the movant used that time, the extent to which the movant has contributed to this perceived predicament, the complexity of the case, the availability of assistance from other sources, the probable utility of a continuance, the extent of inconvenience to others (such as the court, the witnesses, and the opposing party) should a continuance ensue, and the

likelihood of injustice or unfair prejudice attributable to the denial of a continuance.'" *Castillo v.*

*Matesanz*, 348 F.3d 1, 10 (1st Cir. 2003)(quoting *United States v. Saccoccia*, 58 F.3d 754, 770

(1st Cir. 1995), *cert. denied*, 517 U.S. 1105 (1996)).

In rejecting both the petitioner's ineffective assistance of counsel and due process claims,

the Appeals Court held as follows:

> As to the request for a continuance, the defendant bore the burden of justifying the need for the continuance. *Commonwealth v. Scott*, 19 Mass.App.Ct. 983, 985, 475 N.E.2d 78 (1985). "Crucial to the motion was a determination of how the potential witness might measurably contribute to the resolution of factual conflicts expected at trial." *Ibid. See Commonwealth v. Bryer*, 398 Mass. 9, 15, 494 N.E.2d 1335 (1986) (where movant has not established the need for the testimony, reviewing court must find a patent abuse of discretion in order to overrule the trial judge's decision). For the reasons set forth above with respect to the failure of the defendant's claim of ineffective assistance of counsel, defendant has not established the need for the testimony.
>
> Further, we conclude that the trial judge did not patently abuse his discretion in refusing to grant the defendant a continuance, where defense counsel could have summonsed Officer Gomsey between the end of the first day of trial and the close of the Commonwealth's case at 10:55 A.M. on the second day of trial. *See Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964) ("The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied"). Defense counsel knew that the prosecutor was not planning on calling Officer Gomsey for trial, and "[t]he reason presented to the judge when the request was denied was not such as to demonstrate that denial was an abuse of discretion, and a reading of the transcript fails to indicate that the quality of the defense was perceptibly impaired by the denial." *Commonwealth v. Funderberg*, 374 Mass. 577, 580, 373 N.E.2d 963 (1978).

*See* Supp. Ans., Ex. 6, *Commonwealth v. Malone*, 56 Mass. App. Ct. 1117, 780 N.E.2d 489

(2002). As the Appeals Court reasonably determined, with respect to the failure of the

petitioner's ineffective assistance of counsel claim above, the petitioner has not established the

need for the testimony of Officer Gomsey. *See supra* pp. 13-17. Since the Appeals Court cited

and articulated the rule of *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964), and was not presented

facts that were materially indistinguishable from those at issue in *Ungar*, the contrary to portion

19

of the analysis drops from the equation. *See Williams v. Taylor*, 529 U.S. at 406 ("a run-of-the

mill state-court decision applying the correct legal rule from our cases to the facts of the

prisoner's case would not fit comfortably within §2254(d)(1)'s 'contrary to' clause"). Thus,

*Ungar* does not require an outcome "contrary to" that reached by the Appeals Court.

Further, a review of the Appeals Court's decision demonstrates that it was an

objectionably reasonable application of *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). In the

instant case, the record supports the Appeals Court's conclusion that the trial judge did not

patently abuse his discretion in refusing to grant the defendant a continuance, where defense

counsel could have summonsed Officer Gomsey between the end of the first day of trial and the

close of the Commonwealth's case at 10:55 A.M. on the second day of trial. *See* Supp. Ans., Ex.

6, *Commonwealth v. Malone*, 56 Mass. App. Ct. 1117, 780 N.E.2d 489 (2002). At the beginning

of the second day of trial, the petitioner's trial counsel stated that he did not subpoena Officer

Gomsey because he assumed that the Commonwealth would be putting her on the stand.

(Tr.2/4). The trial judge replied that the petitioner had been put on notice the day before that the

Commonwealth would not be calling Officer Gomsey because the Commonwealth had been

limited to one fresh complaint witness by the judge and the prosecutor had told the petitioner that

Brenda would be that witness. (Tr.2/4). The trial judge told trial counsel that he was not being

barred from taking some action, only that the trial judge was continuing with the trial at that

time. (Tr.2/4-5).

The Commonwealth had one more witness that morning, the victim's sister Whitney.

(Tr. 2/5-23). The petitioner's trial counsel then had two witnesses, the petitioner's mother and

the petitioner. (Tr.2/27-68). During this evidentiary part of the case, the petitioner had time to

20

arrange for the attendance of Officer Gomsey.  The Appeals Court's conclusion that trial judge

did not patently abuse his discretion in refusing to grant the defendant a continuance cannot be

considered objectively unreasonable.  Accordingly, the petitioner cannot demonstrate that the

decision of the  Appeals Court unreasonably applied *Ungar*.  Habeas relief should be denied.

## CONCLUSION

For the reasons set forth above, the respondent urges this Court to deny the petition for

habeas corpus relief.

Respectfully submitted,

THOMAS  F.  REILLY
Attorney General


Eva M. Badway
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 727-2200, ext. 2824
Dated: July 26, 2004                BBO # 635431


## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2004, I caused a copy of the above <u>Memorandum of Law
in Opposition to the Petition for Habeas Corpus</u> to be served by first-class mail, postage prepaid,
upon Mr. Derege B. Demissie, *Esq.*  Demissie & Associates, 929 Massachusetts Avenue, Suite
01, Cambridge, Massachusetts 02139.

Eva M. Badway

21